AO 91 (Rev. 08/09) Criminal Complaint                    AUSA T. Cooperstein

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
|  | ) Case No. 10-132-FJL |
| IHAP ABDALLAH YAMIN | ) |
| a/k/a Tommy | ) |
|  | ) |
| Defendant(s) |  |

FILED by _____ D.C.

OCT 26 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __07/12/2010__ in the county of __Okeechobee__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18: 1028 | Fraud and related activity in connection with identification documents, authentication features, and information; and |
| 18:1029 | Fraud and related activity in connection with access devices. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☒ Continued on the attached sheet.

_____
Complainant's signature

Juvenal Martin, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 26, 2010

_____
Judge's signature

City and state: Fort Pierce, Florida

Frank J. Lynch, Jr. U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF
## JUVENAL MARTIN
## SPECIAL AGENT
## FEDERAL BUREAU OF INVESTIGATION

I, Juvenal Martin, being duly sworn, depose and say that:

1. I have been employed as a Special Agent (SA) of the Federal Bureau of Investigation (FBI) for approximately seven (7) years, and I am currently assigned to the Fort Pierce Resident Agency (FPRA) of the Miami Division. Prior to my employment as an FBI SA, I was employed with the Department of Homeland Security, as a United States Border Patrol Agent for approximately three (3) years, assigned to the Douglas, Arizona, station, of the Tucson Sector. At the FPRA, I am charged with investigating violations of federal law, to include the matters related to aggravated identity theft, and offenses in violation of Title 18, United States Code, Sections 1028 and 1029. As a federal agent, I am authorized to investigate violations of United States laws, and to execute warrants issued under the authority of the United States. In the course of these investigations, I have conducted physical surveillance, interviewed witnesses and subjects, and secured other relevant information employing various investigative techniques.

2. This affidavit is based upon my own knowledge derived from reviewing consensual recordings between an FBI Confidential Human Source (CHS) who has engaged in multiple consensually monitored conversations with IHAP ABDALLAH YAMIN (hereinafter

Page 1 of 9

referred to as YAMIN), also known as "Tommy," and upon facts and knowledge conveyed to me by the CHS. Due to exigent circumstances encountered in the course of the investigation, not all of the telephonic conversations or meetings between the CHS and YAMIN were consensually monitored. The exigent circumstances include recording device malfunctions, CHS receiving telephone calls from YAMIN when CHS was not in possession of a recording device, and YAMIN providing little to no advance notice prior to wanting to meet, preventing me from being able to provide CHS with recording equipment.

3. Since this affidavit is being submitted for the limited purpose of securing an arrest warrant for YAMIN, I have not set forth every fact of this investigation.

4. On June 16, 2010, during a debriefing of an FBI CHS, CHS advised that YAMIN was selling fraudulent driver's licenses and re-coded debit/credit cards. On or about June 10, 2010, YAMIN gave CHS a "sample" State of Texas driver's license, number 14105494, bearing the name of Jesus Iara Ibarra, date of birth June 25, 1976, and one sample debit/credit card consisting of an Anne Geddes *MasterCard* debit card, number 5154-6204-4498-8065, expiration date April 2013, with corresponding Personal Identification Number (PIN) 34972.

5. On July 12, 2010, during a consensually monitored meeting, CHS met with YAMIN at Azteca #3, 625 NE Park Street,

Okeechobee, Florida, where CHS purchased three (3) debit/credit accounts from YAMIN for $600. The information purchased from YAMIN consisted of the account number, the account holder's name, expiration date, and PINs, but not physical cards. In addition, YAMIN gave CHS a fourth account for which YAMIN expected to receive payment at a later date. Three of the four aforementioned debit/credit card accounts were given to CHS on handwritten notes, and the fourth was an actual color copy of the debit/credit card with the corresponding information handwritten on it. YAMIN explained to CHS that this debit/credit account information could be used for Internet purchases. YAMIN further explained that if problems were encountered when attempting to make online purchases, that YAMIN would provide a replacement debit/credit account and corresponding account information as described above. During the same meeting, YAMIN informed the CHS that YAMIN had made a "fake" State of Florida driver's license for one of his friends. Tommy went into detail about how he instructed his friend to bring a "proven" address, and how he took a picture of his friend which he used to make the fraudulent State of Florida driver's license.

6.  On July 19, 2010, during a second consensually monitored meeting, CHS engaged in conversation with YAMIN at Azteca, wherein CHS purchased an additional two (2) debit/credit cards from YAMIN for $400, and received an additional one (1) for which YAMIN expected compensation at a later date. All three (3) of the

debit/credit cards consisted of physical debit/credit cards. YAMIN explained to CHS that these debit/credit cards could be swiped through a regular card reader for the purpose of making purchases.

7. During the July 19, 2010, meeting between the CHS and YAMIN described in paragraph 6, YAMIN attempted to swipe CHS's company gas credit card through a debit/credit card reader, to which CHS did not agree. Later during the same conversation, YAMIN agreed to allow CHS to take the device with him/her at a later date, when YAMIN expected CHS to swipe debit/credit cards belonging to paying customers to CHS's company, and thereby capture their personal information.

8. On July 22, 2010, during a consensually monitored conversation between CHS and YAMIN, CHS played a message left on CHS voicemail on July 21, 2010, in which YAMIN informs CHS that YAMIN will be unable to give CHS the debit/credit card reader, because YAMIN's cousin from Fort Myers came to pick it up to add a few things. YAMIN told CHS he has some things if CHS was interested, referring to re-coded debit cards, and that YAMIN could set something up for the next day. YAMIN then explains to CHS that he needed some money.

9. On July 22, 2010, during a telephonic conversation between CHS and YAMIN that was not consensually monitored, YAMIN informed CHS that his cousin from Fort Myers had picked up the credit card reader during the night of July 21, 2010, therefore

YAMIN would be unable to give CHS the credit card reader until a later date. During the same conversation, YAMIN offered to pay CHS $20 for each *MasterCard* gift card CHS purchased from *Walmart*. CHS explained to me that YAMIN wanted to re-code the *MasterCard* gift cards CHS purchased from *Walmart*.

10. On July 25, 2010, during a meeting between CHS and YAMIN in Okeechobee, Florida, that was not consensually monitored, YAMIN informed CHS that his cousin from Fort Myers, Florida, returned the card reader to him early in the morning. YAMIN explained he waited for his cousin until 3:00 a.m. to ensure that he personally received it. YAMIN also informed CHS that the reader contained debit/credit account information that his cousins had downloaded from their place of business in Fort Myers, and that YAMIN had not had the opportunity to download the debit/credit account information onto his computer. YAMIN gave the card reader to CHS with the expectation that CHS was going to swipe company gas cards, as well as customers' debit/credit cards. Following the meeting, CHS made telephone contact with me and arranged to hand over the card reader. I took possession of the card reader, and secured it at the FBI office in Fort Pierce.

11. On July 26, 2010, a Search and Seizure Warrant (SDFL Case #10-84-LRJ) was executed by Immigration and Customs Enforcement Computer Forensic Examiner David R. Malone on the aforementioned debit/credit card reader. During the forensic examination, SA

Malone retrieved two accounts: the first was 4430-4000-3408-2622, Israel Hernandez; and, the second was 4661-8690-1001-0080, Alan Shatto. The card reader was photographed capturing its manufacturer, model, and serial number.

12. On July 26, 2010, via a telephonic conversation between CHS and YAMIN that was not consensually monitored, YAMIN informed CHS that he was receiving telephone calls from his cousin in Fort Myers, who wanted to ensure that everything went through the card reader so that YAMIN could make more cards. YAMIN informed CHS that he needed the card reader back so that he could make more cards.

13. On July 27, 2010, during a consensually monitored meeting, CHS met with YAMIN in Fort Pierce, Florida, for the purpose of returning the card reader. CHS fabricated a story as to the reason why he/she had been unable to swipe any cards through the reader. YAMIN was very upset and informed CHS that by having kept the reader since Sunday (July 25, 2010), CHS "cost" YAMIN $1,500. YAMIN told CHS he was going to check the card reader to make sure that CHS had not "messed" with it. YAMIN told CHS that since his cousins in Fort Myers had people who wanted to buy more cards, he needed to "make" more cards to send them. YAMIN attempted to sell CHS two more cards; however, CHS informed YAMIN he did not have any money to pay for them. CHS asked YAMIN if he was willing to "front" the cards, and that CHS would pay at a later

date. YAMIN declined, and told CHS that he needed the money right away, because he needed to pay for smuggling fees.

14. On July 29, 2010, during a consensually monitored meeting, CHS met with YAMIN, at Azteca. Prior to meeting, CHS fabricated a story of how one of the cards had not worked, and YAMIN agreed to replace it with another card at no cost to CHS. During this meeting, CHS received one (1) debit/credit *MasterCard* gift card, at no cost, as agreed. YAMIN retrieved the card from a clear bin on a shelf behind the cash register. The front of the *MasterCard* displayed account number 5154-6283-6432-6455, expiration date of 04/13, security code 246. On the reverse side of the card, a white sticker with black and white handwritten ink was affixed to it, which contained "Josefina Hernandez 4356-4300-9350-5262 Exp: 04/14 Visa <014> Zip code: 34972-34974". CHS advised that upon entering Azteca, he/she observed YAMIN looking into a black laptop computer, and saw what appeared to be an identification document with the words "Permanent Resident Card." Tommy showed CHS the computer screen and explained that the laptop contained the necessary software in order to produce identification cards, Social Security cards, and to produce debit/credit cards. YAMIN informed CHS he had just purchased two *Sony* laptops online, using stolen debit/credit card information. Tommy explained how he can change IP addresses during the transaction so the transaction cannot be

traced back to him. While at the cash register area, CHS observed the previously identified debit/credit card reader.

15. On July 29, 2010, during a telephonic conversation that was not consensually monitored, YAMIN informed CHS that the person who had been helping him make identity documents who had been deported to Mexico, was expected to arrive on July 30, 2010. YAMIN informed CHS that upon this person's return, this person would immediately return to making identity documents for sale. YAMIN was attempting to gather enough money to pay for the smuggling fees.

16. On August 16, 2010, during a telephone call that was not consensually monitored, YAMIN informed CHS he is selling debit/credit cards to Cubans. YAMIN explained to CHS the Cubans pick up the cards in Okeechobee, will purchase fuel, then sell the fuel to truck drivers for less than the going price per gallon. The fuel is being sold to truck drivers in both Florida and Georgia.

17. On August 17, 2010, during a consensually monitored meeting, CHS met with YAMIN at a predetermined location in Okeechobee, Florida, where CHS purchased ten (10) debit/credit cards for $500. Upon arrival at the predetermined location, I observed a black, four door *BMW* in a parking space, similar to the *BMW* previously identified as being registered to YAMIN. During surveillance, CHS approached the *BMW* and met with YAMIN who was

seated in the passenger seat. After the transaction was complete between YAMIN and the CHS, YAMIN drove away in a western direction. The black *BMW* was bearing Florida license plate 983 INC. Driver and Vehicle Information Database (DAVID) record queries revealed that the *BMW* bearing Florida license plate 983 INC is registered to YAMIN.

18. On September 8, 2010, St. Lucie County Sheriff's Office Deputy Ronald Wentz swiped a total of fifteen debit/credit cards through a debit/credit card reader. The fifteen cards were purchased from YAMIN, as previously described. All of the fifteen cards contained re-coded data, which was different from the data that appeared on the face of the cards.

19. Based on the foregoing facts, I submit IHAP ABDALLAH YAMIN, a/k/a "Tommy," has committed violations of Title 18, United States Code, Sections 1028 and 1029.

Further, your affiant sayeth naught.

                                               Juvenal Martin
                                               Special Agent
                                               Federal Bureau of Investigation

Sworn and subscribed to before me this **26th** day of October 2010.

                                               Frank J. Lynch, Jr.
                                               United States Magistrate Judge